[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JANUARY 25, 2007
THOMAS K. KAHN
CLERK

No. 06-13915
Non-Argument Calendar

_____

D. C. Docket No. 05-00110-CV-BBM-1

TINA MARIE SMITH,
RYAN ANDREW LOLLEY,

Plaintiffs-Counter-
Defendants-Appellants,

versus

DELTA AIRLINES, INC,
DELTA FAMILY CARE RETIREMENT PLAN,
JAMES F. MERNA,
BEVERLY HORD,
MARGIE D. RACE,

Defendants-Appellees,

DELTA FAMILY-CARE DISABILITY AND SURVIVORSHIP PLAN,
DELTA FAMILY CARE MEDICAL PLAN,

Defendants-Counter-
Claimants-Appellees,

L.S.,

Counter-Defendant,

TERRI MARTINEZ,
in her capacity as parent
and guardian of L.S.,

Counter-Defendant-
Counter-Claimant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

**(January 25, 2007)**

Before ANDERSON, DUBINA, and CARNES, Circuit Judges.

PER CURIAM:

Tina Marie Smith ("Ms. Smith") and Ryan Andrew Lolley ("Mr. Lolley")
appeal from the district court's grant of summary judgment dismissing their claims
asserting violations of the Employee Retirement Income Security Act of 1974
("ERISA"), 29 U.S.C. §§ 1001 et seq. Ms. Smith sought benefits from the Delta
Family-Care Disability and Survivorship Plan ("the Plan") after her husband Jerry
D. Smith, Jr. ("Mr. Smith"), a Delta employee, died from a self-inflicted gunshot
wound in the early morning hours of July 9, 2002. The Plan denied the benefits,
concluding that Ms. Smith was not an eligible beneficiary because on the day of
Mr. Smith's death, she did not "[l]ive in the Employee's household or only

2

temporarily reside outside the Employee's household," as required by the Survivorship Plan.[1]  On appeal, Ms. Smith contends that the Survivorship Plan's administrator acted arbitrarily and capriciously in reaching this conclusion.  After careful review of the record and the parties' briefs, we find no error in the district court's grant of summary judgment.

That grant of summary judgment is subject to "plenary review," and this court applies the "same legal standards as those controlling the district court." Paramore v. Delta Air Lines, Inc., 129 F.3d 1446, 1449 (11th Cir. 1997).  The Supreme Court of the United States has established three standards for reviewing a denial of benefits by an ERISA plan administrator: (1) de novo review where the plan does not grant discretion to the administrator, (2) arbitrary and capricious review where the plan does grant discretion to the administrator, and (3) heightened arbitrary and capricious review where the plan grants discretion to the administrator, but the administrator operates under a conflict of interest.  See Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57 (1989); Williams v. BellSouth Telecomms., Inc., 373 F.3d 1132, 1134 (11th Cir.

---

[1]Mr. Lolley, Ms. Smith's natural-born son and Mr. Smith's stepson, is not independently eligible for benefits.  He is eligible for benefits under the Delta Family Care Medical Plan if Ms. Smith is found to be eligible under the Survivorship Plan.  Our discussion will therefore focus on her eligibility.

2004).  Here, the appellant does not suggest there was a conflict of interest and agrees that the plan grants discretion to the administrator; thus, as conceded by the appellant, we review the decision to deny benefits only under the arbitrary and capricious standard.  This standard of review applies to "both the administrator's construction of the plan and concomitant factual findings with respect to each case."  Paramore, 129 F.3d at 1451.  An "administrator's fact-based determinations will not be disturbed if reasonable based on the information known to the administrator at the time the decision was rendered."  Id.

Under the provisions of the plan at issue, Ms. Smith was entitled to receive survivorship benefits as an eligible spouse only if, at the time of her husband's death, she (1) "[l]ive[d] in [her husband's] household" or (2) "only temporarily reside[d] outside [her husband's] household."  The Plan determined that neither criterion applied to Ms. Smith on the event date.  Evaluating the first criterion, the Plan concluded that she did not live in her husband's "household," defining that term under its discretionary authority to mean "those who dwell under the same roof and compose a family."[2]  At the time of Mr. Smith's death on July 9, Ms.

---

[2] We agree with the district court that this definition is a reasonable construction of the term and thus within the Plan's grant of discretionary authority. See Hunt v. Hawthorne Assoc., Inc., 119 F.3d 888, 912 (11th Cir.1997) (applying arbitrary and capricious standard of review where ERISA plan "contains express language conferring discretionary authority upon the administrator to construe its terms").  In fact, the Plan's definition adopts verbatim the dictionary definition of the word "household."  See Merriam-Webster's Collegiate Dictionary 562 (10th ed.

Smith resided at the family's residence in Henry County, Georgia. Mr. Smith had been arrested at his home on July 5 on charges of battery and child cruelty after an incident of domestic abuse. He was released on July 8. That day, Ms. Smith sought and received a protective order making it illegal for Mr. Smith to stay at the Henry County residence or enter it without police escort. It is uncertain whether Mr. Smith established another residence in the few hours before his suicide, although he did list his parents' address in Cobb County, Georgia on an application for a checking account at the Delta Credit Union on the day of his release. He also retrieved some of his belongings from the Henry County residence (under the required police escort) the same day.

Ms. Smith contends that she "[l]ive[d] in [her husband's] household" because she continued to reside at the Henry County residence and that Mr. Smith did not establish another household. We need not decide whether Mr. Smith successfully established another household; as the district court observed, nothing in the Plan's definition of "household" requires that a person have one. However,

_____

1999) ("those who dwell under the same roof and compose a family"). Ms. Smith argues that the Plan's determination that the Smiths no longer constituted a household conflicts with state law on the definition of a marital household. See Varnadoe v. State Farm Mut. Auto. Ins. Co., 112 Ga. App. 366, 369 (1965) (noting that while husband and wife "may temporarily sojourn to another place or abode, . . . they are still a part of the same household so long as no action is taken to end the marital relationship"). However, the Plan was not bound to follow state law when it defined the term "household" as used in the Plan provisions so long as its definition was not arbitrary and capricious.

the Plan's definition does require that the employee and his or her spouse "dwell under the same roof." It is clear that the protective order prevented Mr. and Ms. Smith from satisfying this condition. Accordingly, Ms. Smith failed to qualify under the first eligibility criterion.

The second criterion presents a closer question. In order for the Plan to determine whether Ms. Smith "only temporarily reside[d] outside [her husband's] household," it was necessary to divine the future intentions of Mr. and Ms. Smith. The Plan based its conclusion that the separation was not temporary on the following facts: (1) the extraordinary relief granted Ms. Smith by the protective order, which awarded her sole and exclusive use of the residence; (2) information provided by Mr. Smith's parents stating that their son was planning to see an attorney on July 10 to begin divorce proceedings; (3) information provided by Ms. Terri Martinez (Mr. Smith's previous wife) that Ms. Smith stated she would not take Mr. Smith back for fear that the Georgia Department of Family and Children's Services (DFACS) would remove her son if she moved back in with Mr. Smith; (4) information from the Delta Employees Credit Union showing that Mr. Smith changed his account address from the Henry County address to his parents' address and listed his mother as his nearest living relative, not Ms. Smith. Based upon this information, the Plan concluded that Mr. and Ms. Smith had

permanently separated.

We find no grounds for invalidating the Plan's determination as arbitrary and capricious. To be sure, Ms. Smith cites several facts that would permit reasonable minds to reach a contrary conclusion. First, it is true that Mr. Smith failed to take many steps normally associated with a permanent separation from one's spouse. He did not change his address with Delta's human resource department, change his telephone number, change his driver's license, forward his mail, or hire movers. Ms. Smith maintains that this evidence (or rather absence of evidence), when combined with the couple's history of fighting and reconciling, supports her view that there was no permanent separation. Still, it is not surprising that Mr. Smith accomplished little in the way of rearranging his affairs given the few hours he had between his release from jail and his death. The Plan was justified in placing greater weight on the steps Mr. Smith did take—such as changing the address on his credit union account, which evinced a desire to separate financially from his wife—than on the steps he did not.

Second, Ms. Smith points to several objective facts tending to link Mr. Smith to the Henry County residence that he and Ms. Smith shared. For instance, the plan hired an investigator to determine the residence of Mr. and Ms. Smith at the time of Mr. Smith's death. The investigator's report, while not drawing a

7

conclusion from the facts uncovered, does show that searches based on social security numbers, interviews with acquaintances, and other various searches showed that records still reflected that Mr. and Ms. Smith shared the same address. Also, Mr. Smith's death certificate lists the Henry County residence as his last address. Again, however, it is not surprising that the Smiths' brief separation was not yet found in the records and memories of those they came into contact with. Even if the investigator's report and the death certificate have the advantage of objectivity, they say little about the future intentions of Mr. and Ms. Smith. The Plan chose to rely instead on evidence like Mr. Smith's plans to see a divorce attorney and the changing of his credit union account address, which more directly reflect his intent to separate permanently from his wife.

Third, and most significantly, Ms. Smith argues that the Plan acted arbitrarily and capriciously in crediting the self-serving statements made by Mr. Smith's parents and by Ms. Martinez (whose minor child, fathered by Mr. Smith, now receives the Plan benefits in place of Ms. Smith and her son) over the more objective evidence recounted above.[3] The Plan did not ignore the self-serving

---

[3] Neither Ms. Smith nor the Plan has cited any decision treating a plan administrator's discretion to consider statements made by potentially biased parties, nor have we uncovered one. We think a blanket prohibition on considering such statements would conflict with the deference owed to the plan administrator's conclusions under the arbitrary and capricious standard. See Williams, 373 F.3d at 1137.

nature of these statements; rather, it expressly acknowledged the potential for bias

and gave reasons for accepting their veracity nonetheless. In evaluating Ms.

Martinez's statement that Ms. Smith said she would not take Mr. Smith back, the

Plan specifically found that

> this statement indicative of Ms. Smith's intentions that she would no
> longer reside in the same household as Mr. Smith, and despite any
> potential bias that might exist on the part of Ms. Martinez, was
> credible information. The [Plan] noted that Ms. Martinez, a resident
> of Oklahoma, might not have otherwise been familiar with the term
> DFACS in the absence of Ms. Smith making such a statement.

One could quibble with this reasoning. Ms. Martinez, who had ties to the state of

Georgia through her former husband and father of her child, could have heard

about DFACS through a source independent of Ms. Smith. And Ms. Martinez

could certainly be viewed as having a substantial potential for bias. Yet this type

of judicial second-guessing is exactly what the arbitrary and capricious standard is

meant to curb. See Williams, 373 F.3d at 1137. As for the statement by Mr.

Smith's parents that Mr. Smith planned to institute divorce proceedings, the Plan

"considered th[e] potential [for bias] in weighing the significance that should be

placed on this assertion." The Plan has the discretion to make credibility

determinations and to weigh conflicting evidence. See Paramore, 129 F.3d at

1452 (upholding plan administrator's authority to evaluate conflicting medical

evaluations).  The Plan has given adequate and rational reasons for its decision to accept the truth of these statements.  Furthermore, these statements do not operate in isolation.  The protective order and Mr. Smith's changing of his credit union account address unquestionably buttress the conclusion that the separation was permanent.[4]

Although Ms. Smith has presented many reasons for reaching a different conclusion from the one reached by the Plan, we cannot say that the Plan's decision was an unreasonable reading of "the information known to the administrator at the time the decision was rendered."  Id. at 1451.  Therefore, we affirm the district court's grant of summary judgment.

**AFFIRMED.**

---

[4] Ms. Smith contends that the Plan's determination was "contrary to law" because the ex parte protective order would automatically expire by operation of law unless it were made permanent after a hearing and order.  See O.C.G.A. § 19-13-4(c).  Thus, in her view, the Plan erred in considering the protective order—and the Smiths' separation—to be permanent.  It is clear, however, that the Plan understood that the order was not permanent; it acknowledged that the order was scheduled to be reviewed on July 29, 2002.  Moreover, the Plan did not base its decision on the understanding that the protective order was itself permanent, but merely on the finding that the order evinced the Smiths' intention to separate permanently.  The order clearly supports such a finding.